UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

SAMANTHA RUFF on behalf of LMF,

                       Plaintiff,

    -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                  Defendant.

------------------------------------------------X

A P P E A R A N C E S:

14 Civ. 2433

OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/18/15

**Attorney for Plaintiff**

OLINKSY LAW GROUP
Olinsky Law Group
300 South State Street, Suite 420
Syracuse, NY 13202
By:  Howard D. Olinsky, Esq.

**Attorneys for Defendant**

United States Attorney Office, SDNY
Southern District of New York
26 Federal Plaza
New York, NY 10278-0004
By:  Dennis J. Canning, Esq.
      Leslie A. Ramirez-Fisher, Esq.

**Sweet, D.J.**

Plaintiff Samantha Ruff ("Ruff" or the "Plaintiff") on behalf of minor L.M.F. ("LMF") has moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment of disability of LMF and the grant of Supplemental Security Income ("SSI") benefits, reversing the decision of the Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner" or the "Defendant"). The Commissioner has moved for judgment affirmed denying eligibility under the Social Security Act (the "Act"), as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA" or the "1996 Act"), Public Law 104-193. Disability turns on whether or not the record contains substantial evidence that a medically determinable impairment or combination of impairments of LMF functionally equals a listed impairment resulting in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). Based on the conclusions set forth below, the motion of the Plaintiff is denied, the motion of the Commissioner is granted and her decision is affirmed.

1

**Prior Proceedings**

Plaintiff filed an SSI application on behalf of LMF on August 4, 2010 alleging that LMF became disabled on February 5, 2010.  The claim was denied initially on December 3, 2010. Plaintiff then requested a hearing before an Administrative Law Judge.  On August 22, 2012, Plaintiff and LMF appeared and testified before ALJ Robert Lebron (the "ALJ"), with her representative was also present for the video hearing.  On November 8, 2012, the ALJ issued a decision finding LMF was not disabled.  The Appeals Council denied review on January 15, 2014.  The Appeals Council granted Plaintiff an extension of time to file a civil action on March 13, 2014.  This action followed on April 7, 2014.  The instant motion was marked fully submitted on January 14, 2015.

**The Evidence Presented**

A.  *Evidence Prior to August 4, 2010*

LMF was born in 1999 and was ten years old on the SSI filing date and thirteen years old on the date of the ALJ decision (see Tr. 26).

2

Records from LMF's pediatrician's clinic, Liberty
Pediatric, reveal that she was seen for generally routine care
or minor complaints on two occasions in 2003, twice in 2009, and
twice in 2010 (Tr. 345-50).  On January 26, 2010, Dr. Darshan
Trivedi ("Dr. Trivedi"), LMF's pediatrician at Liberty
Pediatrics saw LMF regarding concerns about mood problems (Tr.
346).  He noted that one of LMF's girlfriends (GF) had committed
suicide (Tr. 346).  Physical clinical findings were unremarkable
(Tr. 346).  The doctor assessed adjustment disorder with
depression (Tr. 346).

Livingston Manor Central School District (LM Schools)
psychologist Sherry Strassman ("Ms. Strassman") did a behavioral
assessment report about LMF on March 8, 2010 (Tr. 214-16).  LMF
and her sister had moved to the district at the beginning of the
school year (Tr. 214).  LMF was generally a C student (Tr. 214).
Math seemed to be her weakest area, and social development and
work habits were well-developed (Tr. 214).  Mrs. Julia Rosner,
LMF's teacher, described her as getting along well with others,
using time wisely, making a good effort, and needing practice in
math and writing (Tr. 214).  Her recent physical examination was
normal (Tr. 214).  The Behavioral Assessment System for Children

3

Assessment 2nd ed. (BASC-2) was administered (Tr. 214-16; see
Tr. 380-83).  Plaintiff rated LMF's behavior and Mrs. Rosner
also rated her behavior (Tr. 215).  Overall, Mrs. Rosner's
ratings showed an average level of behavioral difficulty, except
symptoms of somatization, which was clinically significant (Tr.
215-16).  LMF complained about health and pain, and was
evaluated as "at risk" overall in this area (Tr. 215-16).  Her
adaptive abilities in school were average, but she had
difficulty at home (Tr. 216).  LMF had experienced significant
changes in living arrangements that school year, and might be
having difficulty adjusting (Tr. 216).

### B.    Evidence On and After August 4, 2010

Dr. Trivedi completed part of a report to SSA on
September 20, 2010, and indicated LMF's sole diagnosis was
adjustment disorder with depression (Tr. 335-44).  The doctor
did not respond to questions regarding clinical findings, test
results, symptoms, behavior, or functioning (Tr. 335-44).

On November 15, 2010, Dr. Leslie Helprin ("Dr.
Helprin"), a psychologist, consultatively examined LMF (Tr. 355-
59).  LMF lived with her mother and the mother's boyfriend (Tr.

4

355).  She was able to dress, bathe, and groom herself
independently (Tr. 358).  LMF traveled independently near their
home (Tr. 358).  LMF assisted by washing dishes, doing laundry,
cleaning her room, cleaning the bathroom, cleaning the table,
and serving food (Tr. 358).  LMF did homework with help (Tr.
358).  Plaintiff said that LMF had good family relationships and
adequate peer relationships (Tr. 358).  LMF enjoyed drawing,
soccer, jump rope, basketball, football, listening to music, and
watching television (Tr. 358).  She played basketball on
weekends with school groups (Tr. 358).

        Dr. Helprin noted that LMF was in the 5th grade in
regular classes, received extra help in math and writing, and
had failed language arts, but earned B's and C's in other
subjects (Tr. 355).  LMF had never been hospitalized nor had
prior outpatient psychiatric treatment (Tr. 355).  She started
treatment at Synergy in Monticello, New York, in the Spring of
2009, and saw a psychiatrist monthly and a therapist weekly (Tr.
355).  She was prescribed Vyvanse and Lamictal (Tr. 355).  LMF
sometimes had problems falling asleep, and got up at night for a
drink (Tr. 355).  Plaintiff asserted that LMF had behavioral
problems at home, such as sometimes throwing things at home or
"stomp[ing] off" when told to do something she did not want to

do (Tr. 355).  Plaintiff stated that LMF twice "had an attitude" with her reading teacher (Tr. 355).  She also claimed that LMF did things for attention, but she was unable to provide any examples (Tr. 356).  Plaintiff said LMF had no problems focusing when playing, only on required tasks (Tr. 356).  When the psychologist asked about anxiety and depression, she stated that LMF had fits and would withdraw; and that, before she started medication, LMF sometimes said she wished she were dead (Tr. 356).  LMF, however, denied any actual suicidal thoughts, and clarified that she had said this only in anger (Tr. 356).  Both LMF and Plaintiff agreed that she never attempted suicide (Tr. 356).  Plaintiff said a doctor mentioned somatization based upon LMF often going to the school nurse complaining of (Tr. 356). Dr. Helprin noted that neither Plaintiff nor LMF described any symptoms of thought disorder (Tr. 356).  Dr. Helprin conducted a mental status examination and found LMF to be cooperative with age-appropriate social skills, manner of relating, and overall presentation (Tr. 357).  She was well-groomed and appropriately dressed (Tr. 357).  Her gait, posture, and motor behavior were normal (Tr. 357).  Speech was clear, fluent, and age-appropriate (Tr. 357).  Thought processes were coherent and there was no evidence of delusion, hallucinations, or paranoia (Tr. 357). Affect was full range and appropriate, and mood was positive

6

(Tr. 357).  LMF was fully oriented and sensorium was clear (Tr. 357).  Attention and concentration were mildly impaired as she could not do simple calculations, but could count and do serial 3s (Tr. 357).  Recent and remote memory were mildly impaired (Tr. 357).  Intellectual skills were in the below average range and fund of information was age-appropriate (Tr. 357).  Judgment and insight were age-appropriate (Tr. 357).

Dr. Helprin opined that LMF was able to attend to, follow, and understand age-appropriate directions and complete several age-appropriate tasks (Tr. 358).  She was generally able to maintain appropriate social behavior with some occasional difficulties (Tr. 358).  LMF was able to respond appropriately to changes in her environment, having behaved appropriately throughout the evaluation (Tr. 358).  She generally interacted adequately with peers and adults (Tr. 358).  Diagnoses were: bipolar II disorder, generally controlled with medication and rule out borderline intellectual functioning (Tr. 358-59).  Dr. Helprin assessed that exam findings appeared consistent with some emotional difficulties, but did not appear significant enough to interfere with LMF's ability to function on a daily basis (Tr. 358).

Dr. Howard Ferrin ("Dr. Ferrin"), a State agency physician, reviewed the record on December 2, 2010, and opined that LMF was not disabled (Tr. 90, 361-68).  The doctor specifically considered the report from LMF's teacher regarding her school performance and behavior (see Tr. 206-13) and the report from Dr. Helprin (see Tr. 355-59) (Tr. 368).  Dr. Ferrin opined that LMR's impairments did not meet, medical equal, or functionally equal the Listings of Impairments contained in 20 C.F.R. Part 404, subpart P, App'x 1 (Tr. 90, 363).  In the domain of acquiring and using information, LMF had a less than marked limitation (Tr. 365).  The doctor assessed that LMF had no limitations in the domains of attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for herself, and health and physical well-being (Tr. 365-66).

In January 2011, LMF was given the Wechsler Intelligence Scale for Children-IV (WISC-IV) and it revealed that LMF's full scale IQ was 107 (68th percentile (average)), with scores of 110 in perceptual reasoning (75th percentile (high average)), 112 in processing speed (79th percentile (high average)), 102 in verbal comprehension (55th percentile

8

(average)), and 94 in working memory (34th percentile (average))
(see Tr. 376-77, 436-37).

In March 2011, LMF took the Wechsler Individual
Achievement Test III (WIAT-III) and her basic reading score was
87 (19th percentile), reading comprehension and fluency score
was 83 (13th percentile), and total reading score was 84 (14th
percentile) (see Tr. 377-80, 385).

On March 20, 2011, Ms. Strassman evaluated LMF again
(Tr. 374-84).  She noted absences and a lack of focus and that
LMF's grade average had declined to 64 in the fourth quarter of
the 2009-10 school year, from 75-81 the first three quarters
(Tr. 374).  Ms. Strassman noted that she was a very serious test
taker and thinker (Tr. 376).  She considered the results from
LMF's earlier WISC-IV, WIAT-III, and BASC 2 testing as well as
information from reports, school records, and teachers (Tr. 375,
376).  Mrs. Davis, her English language arts (ELA) teacher,
described her as average in dealing with teachers and peers,
although she was moderately submissive and introverted (Tr.
375).  Learning behavior was average, except for being
moderately high in persistence, organization, and stability (Tr.
375).  Mrs. Davis stated that LMF gave good effort, but had

9

problems catching up if she fell behind (Tr. 375).  LMF had

friends, but told of being bullied (Tr. 375).  Her math teacher,

Mr. Hicks, described LMF as extremely cooperative and obedient

and otherwise average or moderate, with some tendencies to

daydream (Tr. 375).  LMF was a hard worker, but sometimes forgot

simple steps (Tr. 375-76).  Mr. Hicks observed that LMF was

always quiet and polite, and did not talk much with her peers

(Tr. 376).  Ms. Strassman observed a discrepancy between LMF's

abilities and her performance in the areas of reading and total

achievement (Tr. 383-84).  She recommended that LMF be

designated emotionally disabled or learning disabled in the area

of reading, and that she receive special education and

counseling services (Tr. 384).


        On July 12, 2011, Dr. Trivedi completed an assessment

form for the ALJ (Tr. 388-94).  The doctor indicated that the

LMF had no significant physical limitations and did not note any

physical ailments (Tr. 388-94).  The doctor indicated that she

had difficulty counting money (Tr. 394).  An undated and

unsigned adult form, probably from Dr. Trivedi, indicated

moderate limitations, addressed an adult's work-related

functioning, and failed to set forth any supporting clinical

10

findings or test results in support of the assessment (Tr. 396-97).

In an undated medical report to SSA, completed sometime around August 29, 2012, Dr. Irving Stillman ("Dr. Stillman"), a psychiatrist, indicated that he had seen LMF monthly for the past year (Tr. 468; see Tr. 463). The doctor confirmed LMF had no history of psychiatric hospitalizations (Tr. 469). Diagnoses were dysthymia and learning disorder (Tr. 468). In response to a question seeking clinical findings and diagnostic test results to support the diagnosis, he responded only that no lab tests are appropriate for the diagnoses (Tr. 468). LMF's complaints and symptoms were anger, anxiety, and depression, treated with individual therapy two to four times per month and monthly medication management (Tr. 469). Current prescriptions were for Lexapro, Vyvanse, and Clonodin (Tr. 469). LMF did not report any medication side effects (Tr. 469). She was progressing towards her goals (Tr. 469). With respect to the domain of acquiring and using information, the doctor stated that LMF's processing "can be a little slow at times" and she had a hard time understanding certain things (Tr. 470). With respect to attending and completing tasks, he wrote that she had some limitations in a social setting and had difficulty staying

11

on track and focusing (Tr. 470).  Dr. Stillman opined that LMF

had no limitations in any other domains of functioning

(interacting and relating with others, moving about and

manipulating objects, caring for herself, and health and

physical well-being) (Tr. 470-71).  About the same time, he

completed an undated assessment form (Tr. 463-67).  He marked

boxes to indicate that LMF had: marked limitations in the

domains of acquiring and using information, and attending and

completing tasks; less than marked limitations in the domains of

caring for herself and health and physical well-being; and no

limitations in the domains of interacting and relating with

others, and moving about and manipulating objects (Tr. 465-66).


                    C.    School Records and Teacher Reports


            Mrs. Rosner, LMF's 4th grade teacher, completed a

report for SSA in September 2010 (Tr. 206-13).  Mrs. Rosner

described LMF as a very sweet girl who tried most of the time

(Tr. 213).  LMF's problems were academic and her frequent

absences towards the end of the school year affected her

learning (Tr. 213; see Tr. 206).  LMF was in a class with a

student teacher ratio of 15:1 and her instructions levels were

low (Tr. 206).  She was provided special education services in

                                12

math and writing (Tr. 206).  In the domain of acquiring and
using information, LMF had obvious problems in three areas
(comprehending oral instructions, understanding school and
content vocabulary, and providing organized oral explanations
and adequate descriptions), serious problems in six areas
(reading and comprehending written material, understanding and
participating in class discussions, expressing ideas in writing,
learning new material, recalling and applying previously learned
material, and applying problem-solving skills in class
discussion), and a very serious problem in one area
(comprehending and doing math problems) (Tr. 207).  LMF was
independent, but she did not do the work correctly and would ask
for help only rarely (Tr. 207).  In the domain of attending and
completing tasks, LMF had a slight problem in five areas and no
problem in eight areas (Tr. 208).  Mrs. Rosner assessed that LMF
had no problems in the domain of interacting and relating with
others (Tr. 209-10).  LMF also had no problem in the domain of
moving about and manipulating objects or in the domain of caring
for herself (Tr. 210-11).  Mrs. Rosner knew LMF started
medication towards the end of the school year, but was unaware
of any medical conditions or problems with health and physical
well-being (Tr. 212).

An individualized education program (IEP) for LMF was
crafted in April 2011 (Tr. 434-39).  The IEP noted Ms.
Strassman's findings and LMF's performances on the WISC-IV and
WIAT-III (Tr. 435-37; <u>see</u> Tr. 385).  In the area of social
development, LMF's problems with internalizing, causing anxiety,
depression, and somatization, but it was also noted that she got
along well with peers (Tr. 437).  LMF's physical development was
age-appropriate and there were no concerns with physical or
motor skills (Tr. 437).  LMF was assessed with a learning
disability and mental health concerns, needing special services
(Tr. 437-38).  The IEP provided for a 15:1 student teacher ratio
and that LMF would have a consultant teacher each weekday for 45
minutes and weekly counseling services (Tr. 434).  LMF would be
provided additional time on all tests, she would take tests in a
special location, there would be checks for understanding during
testing as allowed, and test directions and questions would be
rephrased as needed (Tr. 435).


LMF passed fifth grade with grades of between 66
(literature) and 86 (writing) (Tr. 420).  On August 8, 2011,
Richard Hemmer, LMF's 5th grade teacher in math all year and for
half the year in writing during the 2010-11 school year,
completed a form (Tr. 400-07).  In the domain of acquiring and

14

using information, LMF had no serious or very serious problems
(Tr. 401).  She had obvious problems in five areas
(comprehending oral instructions, understanding school and
content vocabulary, providing organized oral explanations and
adequate descriptions, recalling and applying previously learned
material, and applying problem-solving skills in class
discussion), and slight problems in five areas (reading and
comprehending written material, comprehending and doing math
problems, understanding and participating in class discussions,
expressing ideas in written form, and learning new material (Tr.
401).  In the domain of attending and completing tasks, LMF had
no problem in four areas and a slight problem in the other nine
areas (Tr. 402).  Mr. Hammer assessed that LMF had no problems
in eight areas in the domain of interacting and relating with
others and slight problems in five areas (Tr. 403).  LMF also
had no problem in the domain of moving about and manipulating
objects (Tr. 404).  The teacher indicated LMF had no problems in
two areas of the domain of caring for herself and only slight
problems in the other eight areas (Tr. 405).  Mr. Hammer was
unable to respond to questions about the domain of health and
physical well-being and reported that LMF did not have an
unusual number of absences (Tr. 400, 406).

15

An IEP for the 2011-12 school year noted Ms. Strassman's findings (Tr. 293-94; see Tr. 215-16).  The IEP noted the WISC-IV results from January 2011 and the March 2011 WIAT-III results (Tr. 294).  Her academic performance was documented, as well as her difficulty with reading comprehension and using context clues (Tr. 294-95, 385).  LMF enjoyed sports and being with friends (Tr. 295).  In the area of social development, LMF's problems with internalization, causing anxiety, depression, and somatization were noted, but it was explained that she got along well with peers, and counseling was recommended (Tr. 295).  Her physical development was age-appropriate and there were no concerns with physical or motor skills (Tr. 295).  LMF was assessed with a learning disability and mental health concerns and needed special services (Tr. 295).

In June 2012 Liberty Schools recommended that LMF attend a summer school program in a 15:1:1 special education setting to prevent regression (Tr. 452-62).

D.   Testimony and Plaintiff's Reports to SSA

16

Shortly after the SSI application, Plaintiff completed a disability report and a function report about LMF (Tr. 178-87, 196-202).  Plaintiff indicated that LMF had no physical limitations and had no problems seeing, hearing, talking, or communicating (Tr. 179-81, 183).  She stated that LMF's impairments affected her behavior with others and stated that medication affected LMF's personality (Tr. 184).  Plaintiff indicated that LMF had friends her own age, could make new friends, generally got along with adults and teachers, and played sports (Tr. 184).  She was unsure whether LMF's abilities to progress in learning was limited (Tr. 182).  Plaintiff noted LMF could not tell time; she could read, but not at the expected level, and she did not understand what she read (Tr. 182).  Plaintiff indicated on the form that LMF did not understand money, but then stated that LMF just needed a little help with money (Tr. 182).  Plaintiff was also not sure whether LMF's impairment affected her abilities to care for her personal needs (Tr. 185).  LMF did not help around the house, did not wash her hair by herself, had trouble cutting her food, and did not accept criticism or correction (Tr. 185).  She did what she was told most of the time "with a fight" (Tr. 185).  LMF was able to use buttons, zippers, tie shoes, brush teeth, comb hair, choose clothes, hang up her clothes, put away toys, obey safety rules,

17

get to school on time, eat using utensils, and take a bath or
shower without help (Tr. 185). Plaintiff was unsure whether
LMF's ability to pay attention and stick with a task was limited
(Tr. 186). She indicated that LMF did not finish things (Tr.
186). LMF started and completed homework if Plaintiff was
helping her (Tr. 186). LMF kept busy on her own, worked on arts
and crafts, and completed chores most of the time (Tr. 186).
Plaintiff stated that when LMF did not take her medication, she
got very depressed and did nothing (Tr. 187, 197).

In another report to SSA, Plaintiff stated that LMF
was very shy and took time to warm up to others (Tr. 203). LMF
had no problems in personal care activities (Tr. 203). She was
able to play with others and by herself, and preferred to play
by herself (Tr. 203). Plaintiff said LMF's behavior was
worsening, she threw tantrums when she did not get her way, and
she pinched herself or hit her head when frustrated (Tr. 203-
04). LMF's homework was not improving, she was falling behind
in school, and she was failing writing (Tr. 203-04).

In a medical treatment form, Plaintiff stated that Dr.
Trivedi recently described her as doing well so long as
medication was maintained (Tr. 300). Another form given to the

18

ALJ indicated that LMF's prescribed medications consisted of Vyanse and Lamictal (Tr. 302).

LMF testified that she was born in 1999 (Tr. 71). She was in regular classes in school, and had extra help with tests and had an aide (Tr. 81-83). LMF attended summer school in order to retain material needed to advance and was going to start 7th grade in September 2012, and liked school (Tr. 72, 78, 79, 81). She sometimes missed school due to illness and other times was afraid to go because she was getting "picked on" (Tr. 82). LMF's grades were "fairly decent" (Tr. 72).

LMF had been seen by Dr. Stillman for about one year (Tr. 74). The doctor prescribed medication (Lexapro, Vyvanse, and Clonidine as needed) and she took the medication daily (Tr. 75-76). LMF later said that it was when she failed to take her medication that she got mad, frustrated, and avoided others (Tr. 80). The medicine also helped her concentrate (Tr. 80). LMF told the ALJ that the medicine enabled her to play and be normal (Tr. 80).

LMF also saw Dr. Trivedi when she felt ill (Tr. 75). LMF had complained that her stomach hurt, but tests found no

19

medical problem (Tr. 87). Plaintiff said the doctor explained
to LMF that just because you did not feel good inside did not
mean you were physically ill (Tr. 87).

When the ALJ asked whether LMF had school friends, she
stated that she had two friends, and that other students were
mean to her (Tr. 78-79).

Plaintiff stated that LMF's IEP seemed to be working
for her, and she was not moved to a special education classroom
(Tr. 85). In addition to learning problems, Plaintiff said LMF
had depression, but the medications were helping (Tr. 85-86).
LMF did not have many friends, and was picked on because she was
slower than other schoolchildren (Tr. 86). Plaintiff stated
that when LMF was being bullied, she became very depressed (Tr.
86). However, she now had episodes of slight depression and the
medication did not let her get as low as before (Tr. 86).

In deciding LMF's SSI claim, the ALJ applied the
three-step sequential evaluation analysis set forth at 20 C.F.R.
§ 416.924(a)-(d). At step 1, the ALJ found that LMF (a school-
age child when the application was filed and an adolescent at
the time of the hearing), had not engaged in substantial gainful

20

activity (Tr. 27).  At step 2, the ALJ found that LMF's bipolar

disorder and learning disorder were severe impairments within

the meaning of the Act (Tr. 27).  At step 3, the ALJ found that

LMF's impairments did not meet or medically equal any impairment

in the Listings (Tr. 27).  Then, the ALJ evaluated her

impairments and determined that they were not "functionally

equivalent" to a listed impairment (Tr. 27-37).  Specifically,

the ALJ found that LMF's only limitation was a less than marked

limitation in the domain of acquiring and using information (Tr.

28-30).  The ALJ found that LMF had no limitations in the

domains of attending and completing tasks (Tr. 30-31),

interacting and relating with others (Tr. 31-33), moving about

and manipulating objects (Tr. 33-34), caring for herself (Tr.

34-35), and health and physical well-being (Tr. 35-37).  The ALJ

found that LMF was not disabled (Tr. 37).


**The Standard of Review**


          This Court reviews the Commissioner's decision by

determining whether it is supported by substantial evidence and

whether the Commissioner applied the correct legal standard.

See Machadio v. Apfel, 276 F.3d 103, 108-09 (2d Cir. 2002).  The

Act provides that the "findings of the Commissioner as to any

21

fact, if supported by substantial evidence, shall be
conclusive." 42 U.S.C. § 405(g); Perez v. Chater, 77 F.3d 41,
46 (2d Cir. 1996). As the Second Circuit held in a child's SSI
disability case, "[w]here an administrative record supports
disparate findings," the reviewing court "must accept the ALJ's
factual determinations." Quinones o/b/o Quinones v. Chater, 117
F.3d 29, 36 (2d Cir. 1997). Thus, if the Court finds that there
is substantial evidence supporting the Commissioner's decision,
the Commissioner's decision must be upheld, even if there is
also substantial evidence for the plaintiff's position. See
Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990); Schauer v.
Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).

Substantial evidence has been defined as "more than a
mere scintilla . . . [and] such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)
(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In
short, the reviewing court is not to decide the case de novo.
Schaal, 134 F.3d at 501; Jones v. Sullivan, 949 F.2d 57, 59 (2d
Cir. 1991).

The SSI program, 42 U.S.C. § 1381 et seq., is a
federal program providing benefits to needy aged, blind, or
disabled individuals who meet the statutory income and resource
limitations.

> The Social Security Act provides:
>
> (i)  An individual under the age of 18 shall be
> considered disabled for the purpose of this title
> if that individual has a medically determinable
> physical or mental impairment, which results in
> marked and severe functional limitations, and
> which can be expected to result in death or which
> has lasted or can be expected to last for a
> continuous period of not less than 12 months.
>
> (ii) Notwithstanding clause (I), no individual
> under the age of 18 who engages in substantial
> gainful activity . . . may be considered
> disabled.

42 U.S.C. § 1382c(a)(3)(C).


Under the Commissioner's regulations, a sequential
analysis is utilized to determine whether a child is disabled.
20 C.F.R. § 416.924(a)-(d).  The 3-step process requires a child
to show: (1) that she was not working; (2) that she had a
"severe" impairment or combination of impairments; and (3) that
her impairment or combination of impairments was of listing-
level severity, i.e., the impairment(s) met, medically equaled,
or functionally equaled the severity of an impairment in the

Listings.  See 20 C.F.R. § 416.924.  In addition, the
regulations provide for a single method for determining
functional equivalence based on domains of functioning.  See 20
C.F.R. § 416.926a(b)(1).  A child's functional limitations are
evaluated in 6 domains:

> (i)   Acquiring and using information;
> (ii)  Attending and completing tasks;
> (iii) Interacting and relating with others;
> (iv)  Moving about and manipulating objects;
> (v)   Caring for yourself; and
> (vi)  Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i-vi).

**Substantial Evidence Supports the Decision of the Commissioner**

The Commissioner's regulations provide that when there
is sufficient evidence for to decide whether an applicant is
disabled, the Commissioner will make a determination or decision
based on that evidence.  See 20 C.F.R. § 416.927.  Here, the
State agency acted to develop the record (Tr. 370-73).  The ALJ
also acted to develop the record (see Tr. 245, 248, 262, 276,
303, 306, 308, 320).

The ALJ found that LMF did not have a marked or
extreme limitation in any of the 6 domains of functioning (Tr.

24

27-37).  In making these findings, the ALJ considered the
relevant medical and educational evidence concerning LMF's
functioning (Tr. 27-37).  To establish disability, there must be
more than subjective complaints.  In particular, there must be
an underlying physical or mental impairment, demonstrable by
medically acceptable clinical and laboratory diagnostic
techniques, which could reasonably be expected to produce the
symptoms alleged.  20 C.F.R. § 416.929(b); accord Gallagher v.
Schweiker, 697 F.2d 82, 84 (2d Cir. 1983).  Here, for the
reasons articulated by the ALJ, most notably the school reports
from the educational professionals most familiar with LMF's day
to day functioning in a challenging setting, constitute
substantial evidence that LMF was not disabled as defined by the
regulations.

     The ALJ is "not required to specifically mention each
piece of evidence in detail, and failure to do so does not
require remand where, as here, the court can glean the ALJ's
rationale from the rest of the decision." Cichocki v. Astrue,
11-755-S, 2012 WL 3096428, *7 (W.D.N.Y. July 30, 2012), aff'd,
729 F.3d 172 (2d Cir. 2013) (citing Mongeur v. Heckler, 722 F.2d
1033, 1040 (2d Cir. 1983).  The ALJ's evaluated the functional
equivalence domains according appropriate weight to reports from

25

LMF's teacher and school, such as the report from Mr. Hammer, one of LMF's teachers, who indicated that she had no more than slight to obvious problems in any domain of functioning (Tr. 28, see Tr. 400-07).  See Social Security Ruling ("SSR") 06-3 (it is appropriate to assign substantial weight to other sources such as teachers).

Notably, LMF's performance in Mr. Hammer's classes occurred after she was started on medication (Tr. 469).  In the aggregate, the ALJ determined that the evidence of record demonstrated functional limitations in one of the six functional equivalence domains, but not to the disabling extent alleged (see Tr. 27-37).

The ALJ considered, but did not find persuasive, Dr. Stillman's undated assessment form (Tr. 463-67).  In that form, he marked boxes to indicate that LMF had marked limitations in the domains of acquiring and using information, and attending and completing tasks; less than marked limitations in the domains of caring for herself and health and physical well-being; and no limitations in the domains of interacting and relating with others, and moving about and manipulating objects (Tr. 465-66).  The ALJ noted that such limitations were

26

inconsistent with the doctor's clinical notes that confirmed LMF had no history of psychiatric hospitalizations that diagnoses were dysthymia and learning disorder (Tr. 468-69) and that treatment consisted only of individual therapy, two to four times per month, and monthly medication management, and LMF was progressing towards her goals (Tr. 469). Dr. Stillman stated, with respect to acquiring and using information, only that LMF's processing "can be a little slow at times" and she had a hard time understanding certain things (Tr. 470). Similarly, the doctor stated in the domain of attending and completing tasks, she had some limitations in a social setting and difficulty staying on track and focusing, not an indication of marked limitations in that domain (Tr. 470). Moreover, LMF's teachers contradicted his assessments in these domains (Tr. 207, 208, 214, 401, 402) and the school psychologist, Ms. Strassman, reported that LMF functioned in the average range regarding her attentiveness (Tr. 215-16). See 20 C.F.R. § 416.927(c)(2)-(4) (treating source's opinion entitled to less weight when unsupported and/or inconsistent with other evidence of record)

The record also contains an undated and unsigned report (Tr. 396-98). While it seems that Dr. Trivedi was sent an adult assessment form, rather than one for children, this

27

check box report indicated that LMF had disabling functional
limitations.  However, that form, as well as other forms from
the doctor, failed to identify any supporting clinical findings
or test results (Tr. 396-97; see Tr. 335-44).  The doctor was
contacted by the Commissioner, who did provide records (see,
e.g. Tr. 306, 346).  The doctor was not a mental health
professional.  The ALJ noted that the form was inconsistent with
reports from LMF's teachers, Dr. Helprin's consultative report,
and Ms. Strassman's reports (Tr. 36).  The Plaintiff stated that
Dr. Trivedi had described LMF as doing well so long as
medication was maintained (Tr. 300).


          If evidence in a claimant's case record is
inconsistent with other evidence or is internally inconsistent,
the ALJ is required to obtain additional evidence (including by
recontacting medical sources) only if the ALJ cannot decide
whether a claimant is disabled based on the existing evidence.
20 C.F.R. § 416.927(c).  Here, substantial evidence existed to
show that LMF was not disabled.  Thus, the ALJ was not obligated
to obtain additional evidence.  20 C.F.R. § 416.927(c); see
Alston, 904 F.2d at 126 (if substantial evidence supports the
Commissioner's decision, the decision must be upheld even if

there is also substantial evidence in support of plaintiff's
position).

The Commissioner noted that the ALJ's evaluation of
the functional equivalence domains is supported by the
assessments of consultative examiner Dr. Helprin who, after
examining LMF, opined that LMF was able to attend to, follow,
and understand age-appropriate directions and complete several
age-appropriate tasks (Tr. 358).  She was generally able to
maintain appropriate social behavior with some occasional
difficulties (Tr. 358).  LMF was able to respond appropriately
to changes in her environment, and the psychologist observed
that LMF behaved appropriately throughout the evaluation (Tr.
358).  She generally interacted adequately with peers and adults
(Tr. 358).  Dr. Helprin assessed that examination findings
appeared consistent with some emotional difficulties, but those
difficulties themselves, particularly with current treatment,
did not appear to be significant enough to interfere with LMF's
ability to function on a daily basis (Tr. 358).

The ALJ's decision comports with the findings of State
agency psychiatrist Dr. Ferrin, who evaluated the available
evidence of record and assessed LMF's degree of functional

limitation (see Tr. 361-68).  Dr. Ferrin considered reports from
one of LMF's teachers and the consultative examination report
from Dr. Helprin (Tr. 368).  Dr. Ferrin assessed that LMF had
severe impairments, but that they did not meet, medical equal,
or functionally equal the Listings of Impairments contained in
20 C.F.R. Part 404, subpart P, App'x 1 (Tr. 90, 363).  In the
domain of acquiring and using information, LMF had a less than
marked limitation (Tr. 365).  The doctor assessed no limitations
in the domains of attending and completing tasks, interacting
and relating with others, moving about and manipulating objects,
caring for herself, and health and physical well-being (Tr. 365-
66).  The ALJ was entitled to rely upon the State agency
consultant.  See 20 C.F.R. §§ 416.912(b)(6), 416.927(e)(2).
Non-examining sources, such as Dr. Ferrin, may override treating
sources' opinions, provided their opinions are supported by
record evidence.  20 C.F.R. § 416.927(e); see Schisler v.
Sullivan, 3 F.3d 563, 568 (2d Cir. 1993); cf. Schisler v. Bowen,
851 F.2d 43, 47 (2d Cir. 1988) ("Where the opinion of a treating
source is being rejected or overridden, there must be a
discussion documented in the file of the opinion(s) and medical
findings provided by the medical sources, an explanation of how
SSA evaluates the reports, a description of any unsuccessful
efforts to obtain information from a source(s), the pertinent

nonmedical findings, and an explanation as to why the
substantial medical evidence of record contradicts the
opinion(s) of a treating source(s). This discussion must be set
out in a determination or decision rationale.")


Genuine conflicts in the evidence are for the
Commissioner to resolve.  The ALJ properly exercised his
discretion in this case.  See Veino v. Barnhart, 312 F.3d 578,
588 (2d Cir. 2002); 42 U.S.C. § 405(g) (providing that the
Commissioner's findings "as to any fact, if supported by
substantial evidence, shall be conclusive"); see also Schaal,
134 F.3d at 504 ("It is for the SSA, and not this court, to
weigh the conflicting evidence in the record").  Here, the ALJ
evaluated the educational evidence and the medical record, and
assessed only a "less than marked" limitation in one of the
functional equivalence domains (see Tr. 27-37).


The domain of Acquiring and Using Information focuses
on how well the child acquires, learns, and uses information.
20 C.F.R. § 416.926a(g).  Based on all of the evidence of
record, the ALJ found that LMF had a "less than marked"
limitation in this area (Tr. 28-30).  The ALJ noted Ms.
Strassman's behavioral assessment (BASC 2) in March 2010 that

31

indicated LMF's reported problems were mostly at home, not in school (Tr. 215-16).  Mrs. Rosner, LMF's teacher, described her as getting along well with others, using time wisely, and making a good effort (Tr. 214).  LMF's adaptive abilities in school were average (Tr. 216).  Ms. Strassman attributed LMF's difficulties to adjusting to new living arrangements (Tr. 216). Although Dr. Helprin assessed LMF's cognitive function as "below average," IQ testing in fact showed that her abilities were in the average range (see Tr. 357, 376-77, 436-37).  Moreover, with respect to this domain, Dr. Stillman stated only that LMF's processing "can be a little slow at times" and that she had a hard time understanding certain things (Tr. 470).  The IEP for 2011-12 noted she had some problems in reading comprehension and use of context clues, but could solve math problems (Tr. 294-95).  Teacher questionnaires indicated that LMF had some problems in acquiring and using information (Tr. 207, 401). Mrs. Rosner noted that LMF did not always do her work correctly, but described LMF a student who tried most of the time and was independent (Tr. 207, 213).  Mr. Hicks, another teacher, described LMF as extremely cooperative and obedient and otherwise average or moderate (Tr. 375).  Notably, LMF passed fifth grade with scores of between 66 (literature) and 86

32

(writing) (Tr. 420). Accordingly, the ALJ found a less than marked limitation in Acquiring and Using Information.

The domain of Attending and Completing Tasks considers how well the child focuses and maintains her attention, and how well she begins, carries through, and finishes activities, including the pace at which she performs activities and her ease in changing activities. 20 C.F.R. § 416.926a(h). The ALJ found that LMF had no limitation, which the record supports (Tr. 30-31). The ALJ noted that Ms. Strassman reported that, despite her problems, LMF functioned in the average range regarding her attentiveness (Tr. 215-16). In the domain of Attending and Completing tasks, both Mrs. Rosner and Mr. Hammer assessed that LMF had no more than slight problems (Tr. 208, 402). Similarly, Dr. Stillman assessed only some limitations in a social setting and had difficulty (but not serious difficulty) staying on track and focusing (Tr. 470). Dr. Helprin found LMF's attention and concentration were only mildly impaired (Tr. 357). Plaintiff herself was unsure whether LMF's ability to pay attention and stick with a task was limited (Tr. 186) and LMF passed 5th and 6th grade (Tr. 72, 420). Consequently, the ALJ properly assessed no limitation in Attending and Completing Tasks. Even if the few, slight limitations in some reports were adopted,

there would be no more than a "less than marked" limitation, and
the finding of "no limitation" would amount to harmless error.
The Supreme Court has held that, in judicial review of
administrative proceedings, the burden of showing harmful error
normally falls upon the party attacking the agency's
determination.  Shinseki v. Sanders, 556 U.S. 396, 410-11
(2009).


        The domain of Interacting and Relating with Others
considers how well the child initiates and sustains emotional
connections with others, develops and uses the language of her
community, cooperates with others, complies with rules, responds
to criticism, and respects and takes care of the possessions of
others.  20 C.F.R. § 416.926a(i).  Here, the ALJ correctly found
that LMF had no limitation in Interacting and Relating with
Others (Tr. 31-33).  Mrs. Rosner described LMF as getting along
well with others and reported that LMF had no problems in this
domain (Tr. 209-10, 214).  Mr. Hammer assessed that LMF had no
more than a slight problem in the domain of Interacting and
Relating with Others (Tr. 403).  Plaintiff indicated that LMF
had friends her own age, could make new friends, generally got
along with adults and teachers, and played sports (Tr. 184).
Plaintiff told Dr. Helprin that LMF had good family

relationships and adequate peer relationships (Tr. 358).  The
2011-12 IEP also indicated LMF enjoyed sports and being with
friends (Tr. 295).  The ALJ's finding of no limitation in
Interacting and Relating with Others was well supported.


          The domain of Moving About and Manipulating Objects is
concerned with how well the child moves her body from one place
to another and how well she moves and manipulates things.  20
C.F.R. § 416.926a(j).  The ALJ found that LMF had no limitation
in this domain (Tr. 33-34).  The ALJ noted, there was no
evidence that LMF had any motor or physical limitations (Tr.
33).  Records from Liberty Pediatrics did not show any
significant abnormalities.  Dr. Stillman and Dr. Trivedi did not
diagnose LMF with any physical impairment or limitation (Tr.
270-71, 335-346, 347-50, 388-94).  Similarly, her teachers did
not indicate any such limitations in their reports (Tr. 201,
404).  Moreover, Plaintiff alleged no difficulty with LMF's
physical abilities and stated that LMF assisted with chores (Tr.
358).  She played basketball with school groups (Tr. 358).  The
ALJ properly assessed no limitation in Moving About and
Manipulating Objects.

35

The domain of Caring for Self considers how well the child maintains a healthy emotional and physical state, including how well her physical and emotional needs met in appropriate ways, how she copes with stress and changes in her environment, and whether she cares for her own health, possessions, and living area.  20 C.F.R. § 416.926a(k).  Here, the ALJ's finding that LMF had no limitation in this domain is supported by substantial evidence (Tr. 34-35).  The ALJ noted that the record demonstrates that LMF could dress, bathe, and groom herself, was capable of traveling in the neighborhood independently, and assisted with some chores at home (Tr. 358).  Further, her teachers reported no limitations in this domain (Tr. 211, 405).  The record supports the ALJ's finding that LMF had no limitation in Caring for Herself.

The domain of Health and Physical Well-Being concerns the cumulative effects of physical or mental impairments and treatments or therapies on the child's functioning that were not considered under the domain of Moving About and Manipulating objects.  20 C.F.R. § 416.926(l).  The ALJ determined that LMF had no limitation in this domain (Tr. 35-37).  As the ALJ stated, the record documents LMF's mental problem, but shows that she was never hospitalized and treatment consisted only of

36

therapy and monthly visits to a psychiatrist (Tr. 355).  Dr. Helprin opined that LMF's difficulties did not appear significant enough to interfere with her daily functioning (Tr. 358).  Both Dr. Ferrin and Dr. Stillman assessed that LMF had no limitations in this domain (Tr. 366, 471).  Thus, the ALJ's conclusion that of no limitation in this area is well supported (Tr. 35-36).

Because the evidence established that LMF did not have an extreme limitation in any single area of functioning, or marked limitations in any two areas, her impairments were not functionally equivalent to a listed impairment.

The Plaintiff has asserted that the ALJ did not adequately explain the credibility finding.  However, the ALJ decides issues of credibility and is "not require[d] to accept the claimant's subjective complaints without question."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).  Deference should be given his judgment since he heard the witnesses testify and observed their demeanor.  Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995); Serra v. Sullivan, 762 F. Supp. 1030, 1034 (W.D.N.Y. 1991).  An ALJ need not blindly accept a

37

plaintiff's allegations of disability.   Fuller v. Shalala, 898
F. Supp. 212, 217 (S.D.N.Y. 1995).


        The ALJ, in assessing LMF's functioning under the six
domains, considered all symptoms and the extent to which these
symptoms can reasonably be accepted as consistent with the
objective medical and other evidence, based on the requirements
of "20 C.F.R. [§] 416.929 and SSRs 96-4p and 96-7p" (Tr. 28).
The regulations and rulings to which the ALJ referred govern the
credibility analysis.   The ALJ explicitly considered many of the
factors outlined in the regulations, including but not limited
to objective findings, medical and non-medical treatment,
teacher's reports, activities of daily living, and the testimony
of LMF and her mother (see Tr. 27-37).   See 20 C.F.R. § 416.929;
SSR 96-7p ("One strong indication of the credibility of an
individual's statements is their consistency, both internally
and with other information in the case record").


        Here, the allegations of disabling limitations alleged
by the Plaintiff are contradicted by teacher's reports that
revealed some limitations, but not near disabling severity, and
by substantially normal clinical findings by treating and
examining sources.   Moreover, the Plaintiff herself indicated

38

that LMF had no physical limitations and had no problems seeing, hearing, talking, or communicating (Tr. 179-81, 183).  The Plaintiff stated that Dr. Trivedi had described LMF as doing well, so long as medication was maintained (Tr. 300).  LMF herself stated that her medication calmed her down and helped her sleep and concentration (Tr. 80, 81).  Further, she testified that it was only when she failed to take her medication that she got mad, frustrated, and avoided others (Tr. 80).  LMF told the ALJ that when she took her medicine, she was normal (Tr. 80).

"The ALJ's rationale for his adverse credibility decision is evident from his references to the . . . record . . . as well as to opinions from two state agency medical consultants. . . .  This was substantial evidence supporting the ALJ's decision not to credit [other evidence]."  Lowry v. Astrue, 474 Fed. Appx. 801, 805 (2d Cir. 2012).

The ALJ correctly determined that the evidence of record demonstrated functional limitations only in one of the six functional equivalence domains, but not to the disabling extent alleged (see Tr. 27-37).

39

**Conclusion**

　　　　Based on the conclusions set forth above, the motion of the Plaintiff is denied and the motion of the Commissioner for judgment on the pleadings is granted and her decision is affirmed.

　　　　It is so ordered.

**New York, NY**
**February  6, 2015**

_____
ROBERT W. SWEET
U.S.D.J.

40